E-FILED
Tuesday, 23 August, 2005  03:10:49 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ILLINOIS MINE SUBSIDENCE INSURANCE FUND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 02-3253 |
| | ) | |
| | ) | |
| PEABODY COAL COMPANY, a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

This case is before the Court on three motions for summary judgment.

Plaintiff moves for summary judgment on its claims and on Defendant's first and second affirmative defenses; Defendant moves on all remaining claims.

At the end of the day, Peabody Coal prevails.

1

# I. FACTUAL BACKGROUND

Plaintiff Illinois Mine Subsidence Insurance Fund ("the Fund") has filed two different motions for summary judgment, one for the entry of summary judgment as to two of Defendant Peabody Coal Company's affirmative defenses. In its other motion, the Plaintiff alleges it is entitled to summary judgment as to its nine remaining claims for damages caused by mine subsidence and on Peabody's other affirmative defense. Peabody seeks the entry of summary judgment on all of the Fund's remaining claims.

This all concerns nine properties which are listed as counts in the Fund's amended complaint: Count I (Abegglen); Count II (Adcock); Count III (Bartok); Count V (Dempsey); Count VI (G&S Enterprises); Count VII (Ladage); Count IX (O'Fallon Lumber); Count XII (Walter); and Count XIII (White).[1] The Fund is seeking damages on these nine counts for reinsurance reimbursements that it made to insurance companies which

---

[1] The Fund states that Count VIII, which pertains to the Norris property, has been voluntarily dismissed. Moreover, it states that Count IV (Campbell) and Count XI (Schweitzer) will be dismissed and that Count X (Patton), Count XIV (Conrath), and Count XV (Selzer) may be dismissed upon proof of valid waivers for surface subsidence.

settled mine subsidence damage claims with their insureds in the cities of O'Fallon and Taylorville, Illinois.  As subrogee, the Fund claims that it is entitled to damages from Peabody.

A. General Background

The Fund alleges it is generally recognized that St. Clair and Christian Counties, Illinois, are areas where greater than 1% of the land had been undermined by coal operators.  O'Fallon is in St. Clair County and Taylorville is in Christian County.  Accordingly, mine insurance must be included in policies insuring residential and commercial properties in these counties, unless waived by the property owner.  See 215 ILCS 5/805.1.  The Fund contends that in the early 1900's, mining was conducted in a "room and pillar" method by which blocks of unmined coal, called pillars, were left to support the roof of the mines and the surface property.  Peabody asserts that this method involves the construction of one or more shafts into the earth, and then driving a main entry and submains creating passageways for the movement of coal and personnel.  Coal is removed and these mined out areas become the "rooms."  Not all of the coal is removed.  The design and

3

construction of a mine includes leaving pillars of coal and rock, which serve as the primary and permanent support for the overlying strata.  The Fund contends that most modern subsidence problems and damage to surface properties are associated with this older room and pillar method of mining coal.  However, Peabody alleges that room and pillar mining has not only been widely used and accepted throughout the twentieth century, but it is also the most common method of underground coal mining even today.

Peabody also alleges that during the period in which the Fund contends that mining took place in this case, other improvements were required in connection with the construction and operation of an underground coal mine, including mechanical contrivances making up air ventilation, electrical circuitry for providing both lighting and electrical power, and devices for transport of both personnel and coal.  In the open passageways and rooms, moreover, some type of secondary support would likely have been used, including timbers, cribbing, rails, bolts, blocking and backfill material.  However, the exact type of secondary support which was used is unknown.

The Mine Subsidence Insurance Act defines "mine subsidence" as

4

"lateral or vertical ground movement caused by a failure initiated at the mine level, of man-made underground mines, including, but not limited to coal mines . . . that directly damages residences or commercial buildings."  215 ILCS 5/802.1(f).  It does not include such movement caused by "earthquake, landslide, volcanic eruption, soil conditions, soil erosion, soil freezing and thawing, improperly compacted soil, construction defects, roots of trees and shrubs or collapse of storm and sewer drains and rapid transit tunnels."  Id.

The Fund alleges that mine subsidence sags may originate over places in mines where the coal pillars have disintegrated and collapsed, or where the pillars have settled into the relatively soft underclay that forms the floor of most mines.  Sags can develop over mines of any depth.  Peabody also contends that mine subsidence generally occurs because of pillar failure.  The strength of the pillar may not be sufficient to carry the load.  Moreover, Peabody notes that the pillars may deteriorate over the passage of time, because the pillars were not designed of sufficient size.  Finally, there may be pillar failure because of unknown geologic conditions.

In 1979, the Illinois General Assembly created the Illinois Mine

Subsidence Insurance Fund as a reinsurer for mine subsidence insurance. See 215 ILCS 5/801.1.  Premiums are collected by a property owner's insurer and paid to the Fund under a reinsurance agreement.  See 215 ILCS 5/803.1(c); 810.1.  The Fund alleges that upon notice by a property owner to its insurer of a possible subsidence claim, the insurer then requests that the Fund assist and determine if there is a valid mine subsidence claim. Geologists assigned by the Fund then conduct a causation investigation to eliminate non-mine subsidence earth movements and to determine if there is a valid mine subsidence claim.  See 215 ILCS 5/802.1(f).  If the Fund determines that the property is being damaged by active mine subsidence, the insurer is so notified and it must undertake its contractual obligation to adjust the subsidence loss claim with its insured.  The Fund will assist the insurer by assigning a damage consultant to assist in determining the actual cash value of the subsidence loss.

Upon satisfactory adjustment by the insurer of the property owner's claim, a request is made to the Fund for reinsurance reimbursement.  This request is accompanied by documentation of the property owner's insurable

interest and verification of mine subsidence insurance coverage.  The Fund reimburses the insurer pursuant to the reinsurance agreement.  Upon payment of the reinsurance subsidence loss to the insurer, the Fund acquires subrogation rights which it exercises in its own right as permitted by law. See 215 ILCS 5/815.1(b).

The Fund alleges that its personnel then attempt to identify the coal company which undermined the property by plotting the surface location over coal maps of the area.  After the coal mine operator has been determined, notice is sent to the company (if it is still in existence) seeking reimbursement of paid reinsurance claims.  The coal company may not be legally liable if it has secured waivers from the surface owners who conveyed the mineral and coal rights to a coal company and allowed the extraction of coal without recourse for damage to the surface property.  The Fund contends that if no waiver exists, the coal company was obliged to remove the coal without injury to the surface property.

B. The Fund's Alleged Undisputed Material Facts in Support of its

First Motion for Summary Judgment[2]

In support of its motion for summary judgment as to nine of its claims, the Fund alleges that in late summer 1999, Stephen K. Danner was assigned by the Fund as a geologist to conduct a causation investigation of five O'Fallon properties whose owners notified their insurance companies of a possible mine subsidence loss.  Danner investigated each property claim and concluded that they were being damaged by active mine subsidence.  Once mine subsidence damage had been confirmed, the Fund assigned a damage consultant to assist the insurer to determine the actual cash value loss to each insured's property.

(1) O'Fallon Properties

Regarding the Abegglen property, the Fund paid State Farm Fire & Casualty $166,900.00 (the maximum amount of coverage) as reinsurance reimbursement and obtained the right of subrogation against Peabody.  As for the Adcock property, the Fund paid State Farm $100,300.00 as

---

[2]These allegedly undisputed material facts are in support of the Fund's motion for summary judgment as to nine of its claims and as to Peabody's third affirmative defense–that it is not liable for undermining performed by a third party.

8

reinsurance reimbursement and obtained the right of subrogation.  This was the maximum amount of coverage under the policy.  Regarding the Bartok property, claim consultant B. E. Meredith determined  that the actual cash value of the subsidence loss was $42,083.00.   Following State Farm's payment to Bartok, the Fund paid State Farm $43,101.00 as reinsurance reimbursement and obtained the right of subrogation.  After State Farm paid the Dempseys the maximum policy recovery of $131,300.00 as to their property, the Fund paid that amount to State Farm as reinsurance reimbursement.

O'Fallon Lumber Company and Harper-Myer, Inc. were insured with Indiana Lumbermen Mutual Insurance Company for mine subsidence damage up to $200,000.00.  Following Meredith's determination that the actual cash value of the subsidence loss exceeded that amount, Indiana Lumbermen paid O'Fallon Lumber and Harper-Myer the maximum policy recovery of $200,000.00.  The Fund paid Indiana Lumbermen the same amount as reinsurance reimbursement and obtained the right of subrogation.

The Fund alleges that Danner plotted the five aforementioned O'Fallon

9

properties on an O'Fallon street map using each street address which was superimposed on a Sidwell plat map, and then transposed onto the Net 76 map which was overlaid on Peabody's St. Ellen final mine map of May 21, 1960. Each of the five O'Fallon properties had been undermined as shown on Peabody's final 1960 map. Peabody has admitted that the five O'Fallon properties were undermined by Peabody between 1957 and 1960. Anthony Kazda, Peabody's only witness, testified that these properties were likely undermined by Peabody after 1957. Moreover, Peabody has not made an independent appraisal or post-subsidence market valuation of the O'Fallon properties. Peabody has stipulated that the amounts claimed by the Fund in its amended complaint for the O'Fallon and Taylorville properties are uncontested.

(2) Taylorville Properties

The Fund contends that between February 1998 and June 2000, James Mahar of Geotechnical Consultants, Inc. was engaged as a geologist to conduct a causation investigation of the four Taylorville, Illinois properties whose owners notified their insurance companies of a possible mine

10

subsidence loss.  Mahar investigated each Taylorville property and concluded that each was being damaged by mine subsidence.  Once mine subsidence was confirmed, the Fund assigned a damage consultant to assist the insurance company to determine the actual cash value loss to each insured's property.

Regarding the Ladage property, claim consultant John A. Ronk determined the actual cash value of the subsidence loss at $40,822.57. Following Central Mutual Insurance Company's payment of $40,572.57 to the Ladages, the Fund paid Central Mutual the same amount as reinsurance reimbursement and obtained the right of subrogation.  As for the Walter property, Meredith determined the actual cash value for the subsidence loss at $42,341.00.  Following Illinois Farmer Insurance Company's payment to the Walters of $41,841.00, the Fund paid Illinois Farmer $38,365.34 and $3,476.00 as reinsurance reimbursement and obtained the right of subrogation.  Ronk determined the actual value of the subsidence loss as to the White property at $18,478.57.  After Cincinnati Insurance Company paid White $16,301.61 as full satisfaction of her claim, the Fund paid

Cincinnati $1,574.79 and $14,726.82 as reinsurance reimbursement and obtained the right of subrogation.  As for the G&S Enterprises property, Meredith determined that the actual cash value of the subsidence loss was $426,562.00.  G&S Enterprises was insured with West American Insurance Company, a member of Ohio Casualty Insurance Group, for mine subsidence damage up to $350,000.00.  Following West American's and Ohio Casualty's payment of $350,000.00 to Dan and Millie Garren (d/b/a G&S Enterprises), the Fund paid Ohio Casualty $350,000.00 as reinsurance reimbursement and obtained the right of subrogation.

The Fund alleges that Peabody has made no independent cause and origin subsidence investigation for the White, Walter and Ladage properties. Peabody has no knowledge that these properties were undermined by a third party.  Moreover, Peabody has not made an independent appraisal or post-subsidence market valuation of the Taylorville properties, including the G&S properties.  Peabody has stipulated that the amounts claimed by the Fund in its amended complaint for these Taylorville properties are uncontested.

The Fund alleges that its geologist, Allen Costello, has replotted the

12

White, Walter and Ladage properties over Peabody Mine No. 58 and determined that each of the properties was undermined by Peabody.[3] These properties are located in Sections 21 and 22, Township 13 North, Range 2 West of the 3rd Principal Meridian.  The Fund contends that on a Nat McFadden certified 1925 Springfield District Coal Mining Company Mine No. 58 map, there was no indication of coal mining in either Section 21 or 22.  However, a Nat McFadden certified 1938 Peabody Mine Map No. 58 shows that the White, Walter and Ladage properties located in Sections 21 and 22 had been undermined.  The Fund asserts that records of the State of Illinois Coal Reports identified the coal operator of Mine No. 58 as Peabody from 1924 to 1952.[4]  Moreover, Peabody has presented no information that third parties had undermined the White, Walter and Ladage properties.

---

[3]Peabody contends that this fact is immaterial to the Fund's motion for summary judgment.  Peabody also asserts that Costello's affidavit, upon which the Fund relies for this allegedly undisputed material fact, is inconsistent with his previous deposition testimony.  Peabody alleges that Costello testified that after plotting the White, Walter and Ladage properties, he could not say whether they were undermined by Peabody, Springfield District Coal Mining Company or some other entity.

[4]Peabody objects to many of these facts alleged by the Fund on the bases that they constitute inadmissible hearsay and because they are without adequate authentication or other foundation.

13

The Fund alleges that G&S property located at 2101 West Spresser, Taylorville, Illinois is located in the southeast 1/4 of the northeast 1/4 of Section 32, Township 13 North, Range 2 West of the 3rd Principal Meridian.  G&S was plotted on a November 14, 1914 Christian County Coal Company Mine No. 1 Map.   This map disclosed that five rooms had been mined in Section 32.  The G&S property is located some 250 feet from these five rooms and was not shown to be undermined on this 1914 map. Moreover, a 1916 surveyed map of Springfield District Coal Mining Company showed that there was no undermining of the G&S property.  A 1925 map certified by Nat McFadden showed the property as having been specifically undermined.  The Fund contends that the mining of the five rooms in the vicinity of the G&S property, some 250 feet north thereof, would not have caused the subsidence damage to G&S in June 2002 as determined by geologist Mahar and reported in his causation report. According to Mahar's report, the direction of the tilt vectors and the pattern of damage in the builders are in the opposite direction and away from the mining in the five rooms north of G&S Property.  The Fund asserts that the

14

records of the State of Illinois Coal Report for 1917-1925 indicate that Springfield District Coal Mining Company Mine No. 8 and Mine No. 58 were operational from 1917-1924.  Thereafter, Peabody operated No. 58 from 1924 to 1952.[5]

(3) Peabody's Corporate History

The Fund alleges that on April 12, 1915, James W. Murray acquired the coal rights from Christian County Coal Company to Coal Mine No. 1 located in Christian County, Illinois.  Murray conveyed the same acquired coal and mineral rights from Christian County Coal Company to Joseph Solari on the same day of the conveyance to him.[6]  Springfield District Coal Mining Company was incorporated as an Illinois corporation in November 1915 with corporate offices at 332 S. Michigan Avenue, Chicago, Illinois. Springfield District Coal Mining remained at that address, the same location as Peabody's corporate offices, until it dissolved in 1929.  The Fund alleges

---

[5] Peabody objects to most of these facts alleged by the Fund on the bases that they constitute inadmissible hearsay and because they are without adequate authentication or other foundation.

[6] Peabody contends that these allegations are irrelevant and immaterial to any issue in the lawsuit.

15

Solari conveyed the coal and mineral rights to Springfield District Coal Mining on May 31, 1917, subject to the mortgage of record by Murray to Christian County Coal Company.

The Fund contends that corporate records for Peabody indicated that Solari was secretary and Stuyvesant Peabody was president of Peabody in 1919-20, 1924 and 1928.[7] Francis S. Peabody died August 27, 1922 as a resident of Hinsdale, DuPage County, Illinois. Solari testified as a witness on September 25, 1925 to admit the will of Francis S. Peabody to probate and was the only witness to establish the heirship. Probate inventory filed for Francis S. Peabody's estate indicates that the decedent owned 9,988 shares of the 10,000 outstanding common shares in Springfield District Coal Mining Company. The list of liabilities of the estate indicated that beginning on October 1, 1918 through May 24, 1922, Springfield District Coal Mining had loaned Francis Peabody $478,622.45 which remained unpaid.[8]

---

[7]Peabody contends that these allegations are irrelevant and immaterial to any issue in the lawsuit.

[8]Peabody contends that many of these allegations constitute inadmissible hearsay or are otherwise inadmissible.

16

The Fund alleges that in a co-executor's verified petition by Stuyvesant Peabody of September 16, 1924 to the probate court, for approval of a sale of mining stock, Stuyvesant Peabody acknowledged that Springfield District Coal Mining had consolidated and merged its properties and all assets, subject to its liabilities, with Peabody.  On October 6, 1924, the probate court authorized the executors to accept $650,000.00 of common and $650,000.00 of preferred stock of Peabody in lieu of stock owned by Francis S. Peabody in Springfield District Coal Mining, "which company with all of its assets, subject to its liabilities has been merged with the Peabody Coal Company, be and the same is hereby approved."[9]

The Fund alleges that on April 5, 1926, in a deed executed by Stuyvesant Peabody as president, and J. Solari as secretary, Springfield District Coal Mining Company Mine No. 58 was conveyed to Peabody.[10] S. Peabody, president of Springfield District Coal Mining on February 18, 1929, signed the certificate of dissolution of that company on behalf of

---

[9]Peabody makes the same hearsay objection to these alleged undisputed facts.

[10]Peabody contends that this assertion is irrelevant and immaterial to any issue in this lawsuit.

17

Francis S. Peabody's ownership of 9988 of the 10,000 outstanding shares of Springfield District Coal Mining Company stock.

### C. The Fund's Alleged Undisputed Material Facts in Support of its Second Motion for Summary Judgment[11]

The Fund alleges that it was determined by Danner on October 5, 1999 that the Abegglen property was damaged due to mine subsidence.  On July 6, 2000, Danner determined that the Adcock property was damaged due to mine subsidence.  He determined on October 11, 1999 that the Bartok property was damaged due to mine subsidence.  It was determined by Danner on September 21, 1999 that the Dempsey property was damaged due to mine subsidence.  Danner determined on October 28, 1999 that the O'Fallon Lumber property was damaged due to mine subsidence.

The Fund alleges that it was determined by Mahar on December 29, 1999, that the Ladage property was damaged due to mine subsidence.  On April 1, 1999, Mahar determined that the Walter property was damaged by

---

[11]Pursuant to its first and second affirmative defenses, Peabody argues that the statute of repose and statute of limitations apply to defeat the Fund's suit.  Peabody does not dispute any of these facts; however, it does allege that many of the facts are immaterial.

mine subsidence.  It was determined by Mahar on November 11, 1999 that the White property was damaged due to mine subsidence.  He determined on August 24, 2000 that the G&S property was damaged due to mine subsidence.

The Fund alleges that Peabody has not undertaken any independent causation investigation of the nine claims on which it seeks summary judgment.  Moreover, in its responses to the Fund's discovery requests, Peabody has admitted that it removed coal and undermined each of the following properties, between 1957 and 1960, identified in the Fund's amended complaint: Abegglen (Count I); Adcock (Count II); Bartok (Count III); Dempsey (Count V); and O'Fallon Lumber (Count IX).  Peabody also admits that the following properties were undermined no later than 1952: Ladage (Count VII); Walter (Count XII); and White (Count XIII).

The Fund alleges that in its response to discovery requests, when asked to identify the specific acts and events that Peabody undertook amounting to an improvement to real property, Peabody stated that such acts included:

> construction of shafts from surface to the coal seam, engagement
> in room and pillar mining, driving a main entry and submains

19

creating passages, removing coal, constructing and erecting roof supports, leaving blocks/pillars of unmined coal which, along with other designed and constructed roof support devices, provided support for the mine roof and strata overlying the coal.

The Fund also notes that in its responses to discovery requests, when asked to identify what supports Peabody erected to support the surface properties, Peabody stated the following:

all of the mine maps disclosed and relied upon by plaintiff depict room and pillar mining. Under such a mining method, support is necessarily employed, with construction of such primary support consisting in the pillars themselves, which are depicted on the mine maps. A variety of secondary supports have historically been used in conjunction with room and pillar mining, including installation of timbers, cribbing, rails, roof bolts, concrete or other type of blocking and backfill material. It is unknown what specific type of secondary supports would have been used on the properties which are the subject of this lawsuit.

D. Peabody's Alleged Undisputed Material Facts in Support of its Motion for Summary Judgment

In support of its motion, Peabody alleges first that all of the properties which are the subject of this lawsuit were undermined, if at all, more than ten years prior to the filing of this lawsuit. Peabody next asserts that the Ladage property suffered mine subsidence damage beginning in or about May 1997. The Fund disputes this assertion, contending the earliest that

the Ladage property damage could be attributed to mine subsidence was when geologist Mahar completed his cause and origin investigation on December 29, 1999, and concluded that the property was being damaged by active mine subsidence.  Prior to that time, there was no conclusive proof that damage to the property was caused by mine subsidence, rather than any other cause.  This lawsuit, including the Fund's claims with respect to the Ladage property (Count VII), was filed on August 15, 2002.

All of the properties which are the subject of this lawsuit were undermined, if at all, by a method known as room and pillar mining. Peabody alleges that in room and pillar mines, the pillars are intended to serve as the primary and permanent support for the surface of the earth.  The Fund disputes this assertion, contending that it is immaterial and that it contradicts Peabody's discovery responses wherein it stated that "leaving pillars of unmined coal . . . provides support for the mine roof and the strata overlying the coal."  The Fund claims that there is no dispute that the unmined coal was the natural and permanent support for the overlying strata, including the surface.  The Fund contends that neither Danner nor

Costello's deposition testimony stated that the pillars are the primary and permanent support for the overlying strata.  It asserts, moreover, that Peabody's only witness, Anthony Kazda, in his affidavit stated that the pillars provide primary and permanent support of the earth's surface.  The Fund alleges that this contradicts Kazda's deposition testimony, wherein he stated that the primary support for the roof where the miners would be working would be the pillars.

In support of its motion, Peabody next alleges that Springfield District Coal Mining Company conveyed its assets, including Mine 58, to Peabody by deed dated April 5, 1926.  Peabody further contends that it did not undermine the property of G&S Enterprises.  Peabody next asserts that Springfield District Coal Mining was voluntarily dissolved in February 1929. Finally, Peabody alleges that there are no statements, certificates or other records of merger between Springfield District Coal Mining Company and Peabody on file with the Illinois Secretary of State.  The Fund disputes this assertion, contending that it is false as established by the newly discovered Form H certificate from the Illinois Secretary of State's archives.  This

certificate, executed by S. Peabody as president of Peabody Coal Company, and filed November 25, 1924, certifies that Peabody's shares of stock issued since August 28, 1924, consisted of 6,500 shares of par value of $100.00 each of preferred stock and 65,000 shares of par value of $10.00 each of common stock, and the consideration received for such capital stock was the following: "All of the coal lands, machinery, tools, fixtures, merchandise and all other assets of Springfield District Coal Mining Company, mainly located in Springfield, Illinois, subject to its liabilities, for a net value in excess of $1,300,000.00 was received in payment."

Peabody contends that the Form H certificate submitted by the Fund must be stricken as untimely.  Moreover, it asserts that even if the Court were to accept this evidence, it is not sufficient to defeat Peabody's motion for summary judgment, in that it does not establish that Peabody specifically assumed Springfield District's liabilities for subsidence damage.

## II. ANALYSIS

In its first motion for summary judgment, the Fund contends that it is entitled to summary judgment on nine of its claims and on Peabody's third

affirmative defense--that the Fund seeks to hold it liable for the acts and omissions of third parties.  In support of this motion, the Fund alleges that Peabody has not produced any admissible evidence to sustain its defenses as stated in its amended answer that: (1) it did not undermine any of the properties; (2) the properties did not sustain mine subsidence damage due to active mine subsidence caused by Peabody's failure to provide sufficient support to the surface property; (3) Peabody was not the owner of the coal rights at the time of the undermining; and (4) Peabody was not legally responsible for the subsidence damage caused by third parties alleged in its third affirmative defense.  The Fund asserts that it is entitled to summary judgment on the nine claims for damages caused by mine subsidence and on Peabody's third affirmative defense because it breached its legal duty to support the surface properties by its mining activities, and is legally liable for the subsidence damage to each of the subject properties.

In its second motion for summary judgment, the Fund contends that it is entitled to summary judgment on Peabody's first and second affirmative defenses.  Peabody's first affirmative defense alleges that the construction

24

statute of repose bars the Fund's action.  <u>See</u> 735 ILCS 5/13-214.  Its second affirmative defense asserts that the statute of limitations renders the Fund's claims untimely.  <u>See</u> 735 ILCS 5/13-205.  The Fund contends that it is entitled to summary judgment as to these affirmative defenses for the following reasons: (1) pursuant to Illinois law, Peabody had an absolute obligation to support the surface property above its mining activities; (2) the statute of repose is inapplicable here since mining activities cannot be construed to be an "improvement to real property," within the meaning of the statute; and (3) the statute of limitations is inapplicable because all of the claims were filed within five years of accrual.

Peabody proffers several reasons as to why it contends it is entitled to summary judgment.  First, it alleges there is no genuine issue of material fact that the acts and omissions of which the Fund complains occurred more than ten years prior to the filing of this lawsuit, so that all counts and claims of the amended complaint are barred by the statute of repose.  Next, Peabody asserts there is no genuine factual dispute that Count VII (Ladage property) was filed more than five years after the first observable subsidence or change

25

in the condition of the property, so that Count VII is, as a matter of law, barred by the statute of limitations. Peabody next contends that there is insufficient admissible evidence to create a genuine factual dispute that Peabody undermined the Ladage, White and Walter properties or that Springfield District Coal Mining Company undermined the property of G&S Enterprises. Next, Peabody alleges that there is insufficient admissible evidence to create a genuine issue of material fact that Springfield District Coal Mining merged with Peabody, and that Peabody assumed the liability of Springfield District Coal Mining for subsidence caused by the mining activity of that entity. Peabody also asserts that there is insufficient admissible evidence to create a genuine issue of material fact that Peabody is otherwise liable for the mining activity of Springfield District Coal Mining, including any subsidence damage to the G&S Enterprises property. Finally, Peabody contends that, as a matter of law, the Fund is and would be unable to allege a prima facie case on issues on which it bears the burden of proof, including that Peabody undermined or is otherwise liable for the mining and any resulting subsidence on the Taylorville properties (G&S Enterprises,

Ladage, Walters, and White).

A. Summary Judgment Standard

In determining whether summary judgment is appropriate, the Court views the record in the light most favorable to the non-moving party. See Sunn v. Nordstrom, Inc., 260 F.3d 778, 783 (7th Cir. 2001). Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact presents a "genuine issue" if it is "one on which a reasonable factfinder could find for the nonmoving party." Patel v. Allstate Ins. Co., 105 F.3d 365, 370 (7th Cir. 1997). An issue of fact is "material" if it is outcome determinative. Id. However, "bare allegations not supported by specific facts are insufficient in opposing a motion for summary judgment." Hildebrandt v. Ill. Dept. of Natural Res., 347 F.3d 1014, 1036 (7th Cir. 2003). Moreover, there can be no "genuine issue as to any material fact" when a party "fails to make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). If the non-moving party fails to make a sufficient showing on an essential element of her case on which she bears the burden of proof, then the moving party is "entitled to a judgment as a matter of law." <u>Id.</u> at 323, 106 S. Ct. at 2552.

B. Peabody's Summary Judgment Motion

(1) Peabody's Arguments

The Court will first consider Peabody's motion for summary judgment. In support of its motion, Peabody contends that the Fund seeks to hold it liable for acts or omissions which the Fund itself claims occurred 40-85 years before this suit was filed, which bars all of the claims under the statute of repose. Peabody also asserts that it is entitled to summary judgment on one of the Fund's claims on the basis that the statute of limitations has expired. Finally, Peabody alleges that the Fund has not provided sufficient admissible evidence to hold it liable as to the Taylorville properties.

In support of its argument based on the statute of repose, Peabody

notes that the Fund alleges that the room and pillar mining affecting the Taylorville properties occurred between 1917 and 1925 (G & S Enterprises property) and between 1925 and 1938 (Ladage, Walters and White properties). The Fund claims that all of the O'Fallon properties were undermined between 1957 and 1960.

The construction statute of repose provides:

> No action based upon tort, contract or otherwise may be brought against any person for an act or omission of such person in the design, planning, supervision, observation or management of construction, or construction of an improvement to real property after 10 years have elapsed from the time of such act or omission.

735 ILCS 5/13-214(b).

The key inquiry is whether the mining activities constitute the "construction of an improvement to real property." Peabody contends that an "improvement," for purposes of the statute of repose, includes construction below the surface of the ground. It notes that in <u>Commonwealth Edison Co. v. Walsh Construction Co.</u>, 177 Ill. App.3d 373, 374, 532 N.E.2d 346, 347 (1st Dist. 1988), the Illinois Appellate Court addressed whether the claims arising from the excavation and underground tunneling which was a part of

29

the Deep Tunnel Project were barred by the statute of limitations.  Peabody

notes that the plaintiff in that case alleged that the defendant "excavated the

earth which was underneath and the under support of plaintiff's transformer

vault and thereby caused damage to plaintiff's electrical equipment and

transformer vault structure."  Id. at 374, 532 N.E.2d at 346.  The plaintiff

in Commonwealth Edison argued that the defendant's excavation and

construction did not constitute an "improvement to real property," pursuant

to the statute.  Id. at 375, 532 N.E.2d at 347.  The court rejected the

plaintiff's contention and determined that the statute of limitations did

apply.  Id., 532 N.E.2d at 347.

In Continental Insurance Co. v. Walsh Construction Co., 171 Ill.

App.3d 135, 140, 524 N.E.2d 1131, 1135 (1st Dist. 1988), the same court

stated, "An 'improvement' is an addition to real property amounting to more

than mere repair or replacement, and which substantially enhances the value

of the property." (citations omitted).  The court determined that the Deep

Tunnel project, which the plaintiff alleged was a "major undertaking to

create and construct a sophisticated underground tunnel system for flood

control and sewer distribution purposes," constituted an "improvement to real property" for the purposes of the applicable statute.  The court noted that the project was not a "mere repair or replacement of parts of the existing sewer system."  <u>Id.</u>, 524 N.E.2d at 1135.  Finally, the Appellate Court of Illinois observed, "Cases from other jurisdictions further demonstrate that the creation and construction of a sophisticated sewer distribution system constitutes an 'improvement to real property,'" pursuant to the statute.  <u>Id.</u> at 1141, 524 N.E.2d at 1135 (internal citations omitted).  Peabody contends that this construction is similar to the underground room and pillar mining at issue in this case.

Peabody further notes that an "improvement" includes "an addition to real property amounting to more than a repair or replacement, and which substantially enhances the value of the property."  This includes "substantial additions or changes to existing buildings."  <u>Calumet Country Club v. Roberts Environmental Control Corp.</u>, 136 Ill. App.3d 610, 613, 483 N.E.2d 613, 616 (1st Dist. 1985) (citations omitted).  Peabody contends, however, that in order to give effect to the legislative purpose, the word

31

"improvement" now has a broader meaning. It need not necessarily enhance the value of the property. "Improvement" has been defined as a "valuable addition" to property such as real estate "or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes." Cross v. Ainsworth Seed Co., 199 Ill. App.3d 910, 921, 557 N.E.2d 906, 913 (4th Dist. 1990) (quoting Hilliard v. Lummus Co., 834 F.2d 1352, 1354 n. 3 (7th Cir. 1987)).

Peabody alleges that an underground coal mine, which includes the pillars designed and constructed to provide support to the surface, constitutes an "improvement" under more than one of the definitional criteria, as determined by the courts in interpreting and applying the statute of repose (or statute of limitations). It emphasizes that the pillars, as a crucial part of the design and construction of a mine, are for the support and benefit of the surface of the property. Peabody notes, moreover, that as surface support, the pillars are at the heart of this lawsuit, in that the basis of the Fund's claims is that Peabody failed to provide adequate support for

the surface of the property.

Peabody claims that the value of the subject properties was enhanced at least to the surface owners who conveyed the mineral interests (or the surface owners at the time of actual mining). It asserts that such owners would generally receive an additional benefit from their ownership of the property, such as lump sum payments or periodic royalties from the coal operator or purchaser of the mineral interests. Peabody contends, however, that the Court need not find that the value of the property has been enhanced. This is because the activity in this case satisfies the definition of "improvement" under other criteria articulated by the courts. Specifically, the construction of an underground coal mine did the following: (1) added to the utility of the property; and (2) adapted the property to a further or additional purpose. Peabody asserts that this case clearly involves design and construction with respect to real property and involves mines which, at a minimum, added to the utility of the property or adapted it to a new or additional purpose. Moreover, there is no factual dispute that such design and construction took place more than ten years ago so that, as a matter of

law, the statute of repose bars the Fund's claims.

Peabody contends that the purpose underlying the statute of repose supports its application in this case.  It notes that the claimed acts or omissions here occurred 40-85 years ago.  The Illinois legislature deemed a claim made ten years after the act or omission in the construction to be sufficiently stale to warrant it being absolutely barred.  Peabody asserts that there are no longer living witnesses with respect to the mining, and there are no known living witnesses who prepared or participated in the preparation of maps and the wide variety of other documents relied upon by the Fund who can vouch for or attack their accuracy or otherwise explain them. Moreover, Peabody claims that some documents no longer exist, or it cannot be determined if they ever existed.

Peabody alleges that given the expansive scope that courts have given to the term "improvement," and in order to give effect to the legislative purpose of the statute of repose, it is entitled to summary judgment on each of the Fund's claims.

(2) The Fund's Arguments

The Fund contends that its claims are not barred by the construction statute of repose, which is inapplicable to those claims.  It asserts that the plain language of the statute of repose, its legislative history, and legal precedent interpreting the statute indicate that it does not apply, and that summary judgment should be entered in favor of the Fund on its two motions for summary judgment.  The Fund alleges that the Court should not apply the protection afforded by the statute to Peabody's mining activities because Peabody was required by law to support the surface property when the coal was removed.  The Fund claims that this legal mandate cannot be transformed into an act of "construction of an improvement" to real property in this case.

First, the Fund asserts that Peabody's argument is defeated by the plain language of the statute of repose in that the facts alleged demonstrate neither construction nor an improvement by Peabody.  The Fund contends that it is unclear whether Peabody ever constructed anything; Peabody can only affirmatively establish that it extracted coal.  The Fund claims that Peabody

operated a coal mine that consisted of room and pillars.  In room and pillar mining, coal is extracted from the earth in certain underground sections, and the mine "takes on the appearance of a honeycomb."  The Fund notes that it recognizes that room and pillar mining sometimes may involve secondary support beyond the support provided by the unmined coal, but Peabody cannot establish that it provided any such support.  Accordingly, the Fund asserts that the plain language with respect to "construction," as used in the statute, cannot be met because Peabody has failed to prove that it constructed anything.

The Fund notes that the statute of repose requires that an "improvement" be made to real property.  It alleges that the relevant criteria for determining whether something constitutes an "improvement to real property" include "whether the addition was meant to be permanent or temporary, whether it became an integral component of the overall system, whether the value of the property was increased, and whether the use of the property was enhanced."  St. Louis v. Rockwell Graphic Systems, Inc., 153 Ill.2d 1, 4-5, 605 N.E.2d 555, 556 (1992).  The Fund contends that

Peabody's extraction of coal did not improve the value of the surface land;
conversely, once the coal was extracted, the land value decreased.  The Fund
claims, moreover, that even if Peabody constructed supporting structures,
which it cannot prove, it has failed to demonstrate how such structures
constituted "improvement[s]" pursuant to the statute of repose's criteria.
Accordingly, it asserts that because no proof has been presented by Peabody
of any "improvement," the Court should conclude that the statute of repose
does not apply to bar the claims.

Next, the Fund contends that the legislative history of the statute of
repose confirms that it is inapplicable.  It notes that the construction statute
of repose applies to those engaged in the design, planning, supervision,
observation or management of construction or the construction of an
improvement.

In determining when a cause of action accrues for statute of limitations
purposes, the Illinois Supreme Court has held, "In an action for damage to
property resulting from the subsidence of land due to inadequate support
after mining, the limitation period begins from the time of subsidence, not

from the time of the mining.  There is no injury until the land has subsided."

West American Insurance Co. v. Sal E. Lobianco & Son Co., Inc., 69 Ill.2d

126, 130, 370 N.E.2d 804, 806 (1977).  The Fund contends that the Illinois

legislature, fully aware of the Illinois Supreme Court's decision noted above,

did not draft the construction statute of repose to apply to coal companies

like Peabody.

Next, the Fund alleges that case law interpreting the statute of repose

confirms that it is inapplicable.  It notes that the relevant criteria in

determining whether coal mining constitutes an improvement to real

property is "whether the addition was meant to be permanent or temporary,

whether it became an integral component of the overall system, whether the

value of the property was increased, and whether the use of the property was

enhanced."  Morietta v. Reese Construction Co., 347 Ill. App.3d 1077,

1081, 808 N.E.2d 1046, 1050 (5th Dist. 2004) (quoting Rockwell Graphic

Systems, Inc., 153 Ill.2d at 4-5, 605 N.E.2d at 556).  The Fund notes that

other courts have interpreted "improvement" as "a valuable addition made

to property (usually real estate) or an amelioration in its condition,

amounting to more than mere repair or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes." Bank of Ravenswood v. City of Chicago, 307 Ill. App.3d 161, 166, 717 N.E.2d 478, 483 (1st Dist. 1999) (quoting Cross, 199 Ill. App.3d at 921, 557 N.E.2d at 913; Hilliard, 834 F.2d at 1354 n.3). Courts have also considered whether the structure at issue has "any actual relation to the use or enjoyment of the real property located above it such that its presence could be considered an improvement." Id. at 167, 717 N.E.2d at 483.

The Fund alleges that the facts in this case demonstrate that at least three of the four criteria noted in Morietta are not met. First, because coal mining ends once the coal is extracted, Peabody's coal mine was obviously not intended to be permanent. Peabody contends, however, that the supports consisting of unmined pillars of coal were intended to be permanent in that they were intended to exist beyond the life of the coal mine. Second, the value of the surface property was not increased. The Fund asserts that once the mine was developed and the mining began, the property value of

39

the surface lessened for fear of mine subsidence.  Moreover, the property damage alleged in this case confirmed the realization of that fear.  Peabody's mining, therefore, did not increase the value of the surface property.  The Fund contends that even assuming Peabody constructed supports underground for the surface, a point that Peabody has failed to prove, the supports did not last.  Moreover, the Fund alleges that Peabody's activities failed to satisfy its legal duty to support the overlying strata, up to the surface, so that there would be no subsidence.  Based on these facts, the Fund asserts that the statute of repose is inapplicable.

The Fund next alleges that Peabody has offered no supporting case law to support its argument pursuant to the statute of repose.  There do not appear to be any cases which are factually analogous to the case <u>sub judice</u>.[12] It further asserts that Peabody's argument that <u>Bank of Ravenswood</u> is an "anomaly" is without merit.[13]

---

[12]The Fund notes that as of 1984, at least 44 states had statutes of repose with similar language to that of Illinois.  <u>See</u> <u>Adair v. Koppers Co., Inc.</u>, 741 F.2d 111, 113 n.2 (6th Cir. 1984).  It does not appear that any jurisdiction has ruled upon the applicability of one of those statutes to coal mining activities.

[13]Peabody makes this assertion in its response to the Fund's motion for summary judgment on Peabody's first and second affirmative defenses.  Because there

The Fund also contends that Peabody's reliance on the two <u>Walsh Construction Co.</u> cases is misplaced.  The Fund contends that <u>Continental Insurance Co.</u>, 171 Ill. App.3d 135, 524 N.E.2d 1131 is inapposite for two reasons: (1) the nature and complexity of the Deep Tunnel Project at issue in that case is consistent with an improvement to real property, unlike coal mines, which are constructed at the mineral estate level of real property and are not intended to be permanent; and (2) the facts surrounding the Deep Tunnel Project illustrate the existence of a major underground tunnel system throughout many areas of Cook County, Illinois, intended to be a permanent system for "flood control and sewer distribution purposes."  <u>Id.</u> at 139, 524 N.E.2d at 1135.

The Fund alleges that the same analysis applies to <u>Commonwealth Edison Co.</u>, 177 Ill. App.3d 373, 532 N.E.2d 346.  It contends that this case is inapplicable to the statute of repose issue with which this Court is

are three motions for summary judgment which are currently pending, it is worth noting that some of the arguments made by the parties are found in more than one place.  In other words, a party may make the same argument in a brief in support of summary judgment and in a brief in response to the other party's motion for summary judgment.

presented.  The Fund claims these cases do not provide Peabody the relief

that it seeks, as the tunnel conferred a direct benefit to the surface property

by improving flood controls to reduce damage to these surface properties.

The Fund alleges that <u>Bank of Ravenswood</u>, which postdates both

<u>Walsh Construction Co</u>. cases by more than a decade, presumably represents

the state of the law in Illinois regarding what constitutes an "improvement"

to real property.  The Fund emphasizes the following language from <u>Bank of

Ravenswood</u>:

> Plaintiffs wish for this court to broadly find that any government
> construction works are an improvement to real property.  This
> argument must fail.  This court should look to whether the
> subway construction was an integral component of the overall
> system.  In this case, the question would be whether the subway
> was an integral part of the function of the residential townhomes
> and enhanced the overall value.  The answer would be no.  A
> subway system, unlike a sewer system . . . does not have any
> actual relation to the use or enjoyment of the real property
> located above it such that its presence could be considered an
> improvement.

307 Ill. App.3d at 167, 717 N.E.2d at 483 (internal quotations omitted).

The Fund contends that the language used by the court in <u>Bank of

Ravenswood</u> plainly adds additional factors that this Court should consider

42

in determining whether Peabody's underground mines constitute an improvement to surface property under the statute of repose. The Fund claims that the coal mines were not a part of the function of what laid above the mines, and there is no evidence of an "actual relation" between the mines and the use and enjoyment of the real property located above the mines. The coal mines and what laid within them at the mineral estate level were temporary in nature and erected for the sole purpose of removing coal. The Fund asserts that the mines were not integral to the function of the surface property, nor is there any evidence of an actual relation between the surface-- the dominant property estate, and the underground mine--the mineral subservient property estate. The Fund contends that there was no improvement to the surface property rendered by Peabody's coal mines; pursuant to <u>Bank of Ravenswood</u>, therefore, the statute of repose does not apply.

The Fund next contends that any argument by Peabody that the construction on the surface for use of its mine operations were improvements to the surface property is without merit. This is because there is no act or

43

omission from such construction activities that Peabody is being charged with in this case, in that those activities did not cause the surface subsidence damage.

Finally, the Fund alleges that an affirmative duty to maintain surface support does not equal an improvement to real property. It asserts that even assuming that Peabody did construct some type of subjacent surface support during its mining activities, this activity does not bring Peabody's actions within the scope of the statute of repose. The Fund contends that complying with a law that is over a century old and abiding by an affirmative duty described by Illinois courts does not equal an "improvement to real property," pursuant to the statute of repose. The Fund claims that providing subjacent support is simply what a mining company must do to extract coal from its mineral estate and obey the law applicable to its business to avoid injury to the surface property.

The Fund notes that in its memorandum in support of its motion for summary judgment on Peabody's first and second affirmative defenses, it alleges that Illinois has for well over a century recognized a common law duty

of mining companies to property owners to provide subjacent surface support for the surface property.  The Fund claims that this duty was first recognized by the Illinois Supreme Court in <u>Wilms v. Jess</u>, 94 Ill. 464 (1880), and has since been followed by Illinois courts.  It asserts that a clear and unquestioned common law duty to provide subjacent support for the dominant surface property codified by the Illinois legislature in 1980 (Surface Coal Mining Land Conservation and Reclamation Act, 225 ILCS 720/1.01 <u>et seq.</u>) does not constitute an "addition" to real property, and does not "enhance" the value of real property.  The Fund contends that the statute of repose does not apply to bar its claim.  Accordingly, the Fund alleges that Peabody's motion for summary judgment on its affirmative defenses involving the statute of repose and statute of limitations should be denied and the Fund's motions for summary judgment should be granted.

(3) Peabody's Reply

In its reply brief, Peabody first disputes the Fund's assertion that there is no evidence that mines were constructed.  Peabody alleges that in one of the Fund's motions for summary judgment, the Fund contends that mines

were constructed.  Moreover, its witnesses have acknowledged that room and

pillar mining involves design and construction.  Peabody next contends that

the Fund's argument that some of type of secondary support would also

likely have been used in room and pillar mining, but exactly what type was

used is unknown, illustrates precisely why the statute of repose should bar

claims which arose 75-80 years ago.

Next, Peabody disputes the Fund's legal arguments.  First, it claims

that the Fund's argument based on legislative history–that in light of the

Illinois Supreme Court's decision in <u>Lobianco</u>, it is clear that the legislature

did not draft the statute to apply to coal companies–is without merit.  It

contends that <u>Lobianco</u> dealt with the issue of when a cause of action accrues

for statute of limitations purposes, and had nothing to do with coal

companies, coal mines, statutes of repose or what constitutes an

"improvement" under the applicable statute.  69 Ill.2d at 130, 370 N.E.2d

at 806.

Peabody next asserts that the Fund criticizes its lack of supporting case

law when the Fund relies exclusively on "a single, renegade case" in <u>Bank of</u>

Ravenswood.  Peabody contends that case is inconsistent with the liberal interpretation given the statute of repose by the Illinois courts, and in direct conflict with the Walsh Construction Co. decisions rendered by the same court, neither of which has been reversed, overruled or otherwise rejected.

Peabody further asserts that the Fund's arguments have mischaracterized the state of the law on the statute of repose.  Peabody notes that the Fund seeks to distinguish both of the Walsh Construction Co. cases because the underground sewer and distribution tunnel was "permanent" and coal mines are temporary, even though Peabody contends that the question of permanence was never addressed or mentioned by the court in either of those cases.  Moreover, Peabody claims that the Fund's description of coal mines as temporary is also inaccurate.  Peabody alleges that regardless of the duration of actual mining, the mine itself, including the supporting pillars, are intended to be permanent.  Peabody also contends that in trying to distinguish the Walsh Construction Co. decisions, the Fund's allegation that the underground construction in those cases "conferred a direct benefit to the surface property by improving flood controls to reduce damages to the

surface properties" is misleading and false.  Peabody asserts that in neither
of those cases did the court say anything about the tunnel providing a
benefit to the surface.  Moreover, neither of those cases suggested that a
direct benefit to the surface was a requirement or a consideration in
determining whether an underground system is an "improvement."

Peabody next alleges that it is misleading for the Fund to state that
"Illinois courts" have also considered whether the structure has any relation
to the use or enjoyment of the property above it.  Peabody claims that only
one case, Bank of Ravenswood, has ever suggested such a consideration, and
that was a case in which the court also held there was insufficient evidence
that the structure was an improvement.

Peabody next notes the Fund's reliance on the Morietta criteria:
whether an addition was meant to be permanent or temporary, whether it
became an integral part of the system, whether the property value was
increased, and whether the use of the property was enhanced.  347 Ill.
App.3d at 1081, 808 N.E.2d at 1050.  Peabody claims that no court has ever
held that all four of these factors must be satisfied.  Moreover, it alleges that

the Fund has distorted and invented facts in claiming that three of the four factors are not present in this case.   Peabody claims that while acknowledging Peabody's contention that the supporting pillars were meant to be permanent, the Fund states that they did not last and failed to prevent subsidence.  Peabody asserts that the fact that the pillars may have failed is irrelevant; the relevant inquiry is "whether they were meant to be permanent."  Similarly, Peabody alleges that while the Fund admits that the use of the property was enhanced, the Fund claims the enhancement was only temporary.  Once again, Peabody claims this is not the proper inquiry, given that courts have not required that the enhancement be permanent. Finally, regarding the Fund's statement that the value of the surface was lessened "for fear of mine subsidence," Peabody alleges that the Fund provides no factual support for its statement.

Peabody next alleges that the Fund has accurately admitted that the real definitional requirements of an improvement include an item costing labor or capital and intended to enhance its value, beauty or utility or to adapt it for new or further purposes.  Peabody claims that the Fund has all

but admitted those requirements are satisfied in this case.  The Fund has acknowledged a coal mine enhances the use of the property, and the Fund has further conceded that "by constructing an underground coal mine, the mineral estate property has been adapted for a new purpose, coal mining."

As for the Fund's argument that the statute of repose should not apply because a coal operator has a duty to provide subsurface support as part of the coal mine, Peabody contends that the Fund cites no authority for this claim.  Peabody alleges that the Fund fails to recognize the basic principle that affirmative defenses such as statutes of repose bar claims, even in the face of a recognized legal duty and cause of action.  Peabody notes that most construction is subject to a wide range of duties imposed by law or the common law duty to do work in a good and workmanlike manner.  It alleges this fact does not render the statute of repose inapplicable.

(4) The Court's Interpretation

As the Court has noted, one argument advanced by Peabody is that the statute of repose must be liberally construed so as to fulfill the objectives for which it was intended.  In other words, the purpose of avoiding the litigation

of stale claims supports the application of the statute of repose to bar the Fund's claims.  However, this contention by Peabody simply begs the question.  While it is probably true that there are no living witnesses with respect to the mining or witnesses who prepared or participated in the preparation of maps and/or other documents--particularly those acts or omissions which occurred 80 or more years ago--it does not necessarily follow that an underground coal mine is an "improvement to real property."  Any claim arising from activity engaged in 40-85 years ago could fairly be described as "ancient" or "stale."  However, that says nothing about whether the mining involved in this case is an "improvement to real property," and that is the very issue the Court must determine.

The Court has noted that there do not appear to be any cases which address whether, pursuant to the construction statute of repose, an underground coal mine is an "improvement to real property."  The primary cases relied on by the parties include the two Walsh Construction Co. cases and Bank of Ravenswood.  Cases interpreting the relevant language in the statute of repose (or the same language in the statute of limitations) have

51

determined that an "improvement" is "a valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes." Bank of Ravenswood, 307 Ill. App.3d at 166, 717 N.E.2d at 166 (quoting Cross, 190 Ill. App.3d at 921, 557 N.E.2d at 913; Hilliard, 834 F.2d at 1354 n.3).

Applying the definitional criteria, there seems to be little question that some type of construction occurred, even though the Fund now alleges there is no proof that any construction occurred. As Peabody contends, however, the Fund previously alleged that construction has taken place. The question then becomes whether the construction was "a valuable addition" to the property. While the property's value may not have been enhanced in the long run, it would appear that as Peabody contends, the value of the properties was enhanced at least to the surface owners who conveyed the mineral interests at the time of the mining. See e.g. Manning v. Frazier, 96 Ill. 279, 1880 WL 10104 (1880). Consequently, the mines could at least at

the time of construction and for a brief period thereafter be described as a "valuable addition" to the property.

It also seems obvious that the design and construction of a coal mine would amount to "more than mere repairs or replacement" and would cost labor and capital.  The next consideration is whether the addition was "intended to enhance [the property's] value, beauty or utility or to adapt it for new or further purposes."  While it is unlikely that anyone would argue that the mines add to the beauty of the property, there is no question that the construction of an underground mine adds to the utility of the property and adapts it for further or additional purposes.  Accordingly, the Court concludes that the design and construction of a coal mine is consistent with the definition of "improvement to real property," as that phrase has been defined in Bank of Ravenswood and in other cases.

The other language on which the Fund relies is, "Relevant criteria for determining what constitutes an 'improvement to real property' include: whether it became an integral component of the overall system, whether the value of the property was increased, and, as to the overall system, whether

the value of the property was increased and whether the use of the property was enhanced." Bank of Ravenswood, 307 Ill. App.3d at 166, 717 N.E.2d at 483 (citing Rockwell Graphic Systems, Inc., 153 Ill.2d at 4-5, 605 N.E.2d at 556). Courts have also considered whether the addition was meant to be permanent or temporary. See Morietta, 347 Ill. App.3d at 1081, 808 N.E.2d at 1050.

The Court has already examined most of the above factors. As for the others, it seems reasonable to conclude that the construction was an integral part of the overall system, given that the mines' supports were necessary in order to extract coal from underneath the surface of the earth. The Fund contends that because coal mining ends when the coal is extracted, the mines were not intended to be permanent. As Peabody alleges, however, the coal mine and the supporting pillars were intended to last beyond the duration of the actual mining. The mines were "meant to be permanent" and that is the relevant inquiry–not whether they actually were permanent.

Applying these principles, the Court concludes that a coal mine is an "improvement to real property" under Illinois law. The Court is not

persuaded by the Fund's reliance on <u>Bank of Ravenswood</u>.  In that case, the
Appellate Court of Illinois alluded to some of the aforementioned factors in
considering whether an underground subway tunnel constitutes an
"improvement."  <u>See</u> <u>Bank of Ravenswood</u>, 307 Ill. App.3d at 167, 717
N.E.2d at 483 ("This court should look to whether the subway construction
was an integral component of the overall system.  In this case, the question
would be whether the subway was an integral part of the function of the
residential townhomes and enhanced the overall value.  The answer would
be no.").  In determining whether the tunnel was an improvement, therefore,
the court in <u>Bank of Ravenswood</u> considered only a couple of the relevant
factors–whether it was an integral component of the overall system and
whether it enhanced the overall value.  Finally the court concluded, "A
subway system, unlike a sewer system . . . or construction work on a traffic
intersection . . . does not have any actual relation to the use or enjoyment of
the real property located above it such that its presence could be considered
an improvement."  <u>Id.</u>, 717 N.E.2d at 483 (internal citations omitted).

As Peabody alleges, it appears that <u>Bank of Ravenswood</u> is the only

case which suggests that whether the structure has any relation to the use or enjoyment of the property above it is an important consideration.  Moreover, that case seems to place an inordinate emphasis on whether the value was enhanced, which is just one of several factors.  See Herriot v. Allied-Signal, Inc., 801 F. Supp. 52, 56 (N.D. Ill. 1992) ("[U]nder this expanded definition, an improvement is not limited to that which 'substantially enhances' the value of the property.  Rather, an improvement may also enhance the beauty or utility of that property or adapt the property to different or further purposes.").  The Court has already concluded that the value of the property was enhanced at least for a brief period.  Moreover, the coal mines clearly enhanced the utility of the property and adapted it for further purposes.

## III. CONCLUSION

For the foregoing reasons, the Court concludes that the construction of coal mines involved "improvements" as that term has been interpreted under Illinois law.  Because any act or omission associated with this construction occurred well over ten years ago, all of the Fund's claims are

barred by the statute of repose.  Accordingly, Peabody is entitled to summary judgment on the basis that the Fund's claims are barred by the statute of repose.  The Court need not consider Peabody's alternative reasons as to why it is entitled to summary judgment.  Having concluded that the Fund's claims are barred by the statute of repose, moreover, the Court need not address the Fund's arguments as to why it is entitled to summary judgment.

Ergo, the Plaintiff's motion for summary judgment on the Defendant's first and second affirmative defenses is DENIED.  The Defendant's motion for summary judgment is ALLOWED.  The Plaintiff's motion for summary judgment on its claims is DENIED.  All remaining motions are DENIED AS MOOT.  The Clerk will enter judgment in favor of the Defendant and against the Plaintiff.

ENTER:  August 23, 2005

FOR THE COURT:

s/Richard Mills
United States District Judge

57